**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**JOHN B. HARDWICKE COMPANY, Appellee.**

No. 14212.

Court of Civil Appeals of Texas.

San Antonio.

June 10, 1964.

Kleberg, Mobley, Lockett & Weil, Corpus Christi, for appellant.

North, Blackmon & White, Corpus Christi, for appellee.

BARROW, Justice.

John B. Hardwicke Company, shipper, sued Missouri Pacific Railroad Company, carrier, to recover damages arising out of two shipments of produce. Each shipment is a separate count and a separate lawsuit. After a non-jury trial, judgment was rendered for shipper for the sum of $300.00 on Count I, and for $373.79 on Count II. Carrier has perfected this appeal.

The shipper pleaded a prima facie case under the common law rule on both counts. This rule was recently held by the Supreme Court in Missouri Pacific Railroad Co. v.

Elmore & Stahl, 368 S.W.2d 99 (Tex.1963), aff. 84 S.Ct. 1142 (1964), to apply to shipments of perishables:

"Under the general common law rule, a shipper of goods by common carrier makes a prima facie case of carrier liability by showing that the shipment was in good condition when delivered to the carrier at place of origin and in damaged condition when delivered by the carrier at destination. The carrier may then escape responsibility for the damage only by showing that it was caused solely by one or more of four excepted perils: (1) an act of God; (2) the public enemy; (3) the fault of the shipper, or (4) the inherent nature of the goods themselves. Where the loss is not due to one of these specified causes, it is immaterial whether the carrier has exercised due care or was negligent."

## COUNT I

This count involves a car containing 779 sacks of onions loaded at McAllen on May 7, 1960, for shipment to New York City. The car was timely delivered at destination, but the lading was protested for damaged and decayed condition. The trial court made findings of fact which established a prima facie case and, in addition, found that the onions were damaged due to rough handling in transit.[1] Carrier asserts

1. "COUNT I.
"1. Car ART 27450, containing 779 sacks of onions was delivered by plaintiff to the defendant carrier at 8:30 o'clock p. m., May 7, 1960, at which time defendant issued its uniform bill of lading.
"2. The onions in Car ART 27450 were in good condition at origin when delivered to the defendant on May 7, 1960.
"3. The onions in Car ART 27450 were in a damaged condition in New York as they contained from 0-16%, average 6%, bacterial soft rot, and 21 sacks required recoopering attention, of which eleven were made good, and ten were rejected.
"4. Upon inspection of the onions at New York, the load was found to be shift-

ed from 8″ to 12″, which was the result of rough handling in transit, causing the damage to the onions.
"5. The damaged condition of the onions at destination was not the result of an act of the shipper, inherent vice of the commodity, or other excepted cause.
"6. The carrier did not delay the car, and its record shows no ventilation defects, however, the carrier has not shown a clear record of handling as it has not shown itself free of negligence with regard to the shifted condition of the load.
"7. After taking into consideration the quality of the onions, their size, color and condition, the Court finds that the difference in value in their damaged condition and the value in the condition in

that there is "no evidence" to support these findings. No complaint is made of lack of pleadings to support the finding of rough handling.

It is our opinion that the trial court's judgment on this count should be affirmed on the basis of the finding that the onions were damaged by rough handling. There is evidence that at destination the lading had shifted eight to twelve inches, and that twenty-one bags required recoopering. Eleven were made good and ten were rejected. No unusual bruising was noted on any of the destination inspection reports. There was testimony by Mr. Hardwicke, however, that such a shift in the lading would cause bruising and subsequent decaying of the onions, and further that a shift would interfere with the ventilation of the car and cause rot. This testimony, although controverted by carrier's witnesses, supports the finding of damages by rough handling.

In Yeckes-Eichenbaum, Inc. v. Texas Mexican Ry. Co., 263 Fed.2d 791 (Fifth Cir.Ct.) the Court distinguished "breakage claims" from claims due to the nature and condition of the commodity. Where damage occurs from breakage, the burden is upon the carrier to show that the lading had sustained this damage prior to delivery to the carrier. Here there was no such proof. Carrier's point complaining of shipper's failure to show good condition of the onions at origin is therefore immaterial. See also, Missouri Pacific R. Co. v. Trautmann Bros., Tex.Civ.App., 301 S.W.2d 240.

There was evidence that the onions at destination were found to have some green tinge and brown staining which would affect their sales price. These defects were shown to be due to growing conditions. We cannot say, however, that the evidence is undisputed that this was the sole cause of the damaged condition of the onions. The government market reports were introduced into evidence to show value of Texas onions at destination on date of arrival. The trial court properly considered the quality and condition of the onions in determining the amount of damages. S. & D. Wolf Co. v. Atchison, Topeka & Santa Fe Ry. Co., Tex.Civ.App., 301 S.W.2d 272.

There is evidence to support the trial court's findings which are the basis of the judgment on Count I.

## COUNT II

This Count involves a car containing 640 cartons of lettuce delivered to the carrier at McAllen on January 18, 1960, for shipment to Newark, New Jersey. There was no delay in transportation. The lettuce had been sold to Safeway Stores for the sum of $2,880.00, F.O.B. plus a charge for vacuum cooling. On arrival at destination, Safeway Stores refused the lettuce on account of decay, and the car was diverted by shipper to Benjamin Koondel, Inc., at New York City. It was subsequently sold and shipper netted the sum of $1,964.59. The trial court made findings of fact which established a prima facie case for shipper, and, after considering the quality of the lettuce, found that the difference in value at destination in its damaged condition was $373.79 less than it should have been.[2]

which they should have been, together with interest from May 7, 1960 at 6% per annum is $300.00."
2. "COUNT II.
"1. Car ART 37163 with 640 cartons of lettuce was accepted by the defendant at 11:50 p. m. January 18, 1960 and the uniform straight bill of lading was issued at that time.
"2. At time of delivery to the carrier, the lettuce graded U.S. No. 1 and contained 1% decay which was well within

the tolerance for U.S. No. 1 lettuce. The lettuce had been vacuum cooled by plaintiff and had a commodity temperature of approximately 34° and was loaded in precooled car. The lettuce was in good condition at origin.
"3. Upon inspection at destination, the lettuce contained heavy decay.
"4. Although the carrier's records of icing seems to show that the carrier iced the car at each icing station in accordance with the tariff, the testimony

The carrier asserts that since it performed the transportation services as directed by shipper, the trial court erred in not entering judgment for carrier. There is no finding that the damage was solely caused by the inherent nature of the lettuce. This point has been decided adverse to carrier by the Supreme Court's application of the common law rule to shipments of produce. Missouri Pacific Ry. Co. v. Elmore & Stahl, supra.

The carrier further urges that there is no evidence to support the trial court's finding that the lettuce was in good condition at origin, or that it was in any worse condition at destination than it should have been. The lettuce was inspected at origin by a Department of Agriculture inspector and found to be U. S. No. 1, with defects within grade tolerances, including 1% decay. A supplemental letter from the inspector's supervisor noted the following range of defects at the origin inspection: "In few samples no defects noted. Remainder of load most samples none, some 4% broken midribs; most samples none, many 4% tipburn; most samples none, many 4% discoloration; most samples none, some 4% decay. General range 4 to 12%, mostly 4 to 8%, averaging 6%, including 2% soft and 1% decay."

Three inspections were made at destination with widely varying results. The National Inspection Service found "0–20%, average 9% tipburn; 20–32% whitish, 36–52% show pink discoloration of midribs, or sides of heads; butts red to rusty; range 0 to 8%, average 4% decay." A U. S. Agricultural Department inspector found "4 to 12 heads per carton averaging approximately 30% tipburn; 4 to 18 decayed heads per carton averaging approximately 40% Bacteria Soft Rot all stages affecting 2 to 4 inner head leaves to entire head." A Railroad Perishable Inspection Agency inspector found "8% with broken mid-ribs generally firm. Fairly good to good color. 24 to 64% average 44% tipburn. Fresh and crisp. 4 to 32% average 14% decay, affecting head leaves following tipburn." This inspector also found that 34 packages required recoopering, of which 32 were made good and two were rejected.

Despite the wide variances in the amount of tipburn found in the three destination inspections, it is undisputed that tipburn is a disease occurring during growth of the lettuce and is not caused by transportation. It is also established that decay will occur at the tipburn spot. There was evidence, however, to support the trial court's finding that decay would not occur in transit if the lettuce was properly refrigerated. The carrier's records reflect that the car was properly iced, but there was no stipulation or finding that the records correctly reflect what services were performed.

In Thompson v. Bob Tankersley Produce Co., Tex.Civ.App., 289 S.W.2d 840, this Court held that the jury finding of good condition at origin was supported by sufficient evidence where a U. S. D. A. inspec-

---

was undisputed that decay would not advance at temperatures below 40°, and that the temperature of the lettuce should remain at approximately 34° to 35° in the car under standard refrigeration. The only logical inference to be drawn is that the carrier did not keep the lettuce properly refrigerated in transit.

"5. The lettuce contained tipburn which was a field defect, but the decay would not have occurred if the lettuce had been properly refrigerated in transit. The loss was not the result of the act of the shipper or of inherent vice of the lettuce.

"6. The load was shifted 4″ from the 2nd layer through the top layer and 34 cartons required recoopering, of which 32 were made good and 2 were rejected.

"7. The railroad failed to prove that it had transported the lettuce without negligence.

"8. After taking into consideration the quality of the lettuce and its condition at origin and destination, the Court finds that the difference in value in its damaged condition at destination and the the value in the condition in which it should have been, together with interest from January 25, 1960 at 6% per annum is $373.79."

tion at origin graded tomatoes as U. S. No. 1, although the jury also found that a late blight disease was present in the tomatoes at the time of delivery to carrier. The Court said, "the jury could have properly concluded that although the tomatoes were not perfect and were affected somewhat with late blight, they, nevertheless, could with reasonable care have been transported to their destination without such decay developing to such extent as would have thrown the tomatoes out of grade." It was further held that the burden of apportionment between causes fell upon the carrier.

In Thompson v. Tankersley, Tex.Civ. App., 238 S.W.2d 263, this Court held that the burden was upon carrier to show that the damaged condition of tomatoes was caused solely by shipper, and to apportion the damages where origin inspection showed 80% U. S. No. 1, and final inspection showed rot following small growth cracks of shoulder scars. This latter condition was shown to have been caused by rapid growth of the tomatoes. It was further shown that rot could develop rapidly from this growing condition if the tomatoes were bruised. The Court determined that it could not be said as a matter of law that the damage was due solely to an inherent vice or defect in the tomatoes coupled with delays caused by the shipper.

▪ It is therefore our opinion that the trial court's finding of good condition at origin is supported by evidence. The lettuce was shown to be in a damaged condition at destination. These findings made a prima facie case for shipper under the common law rule. The above evidence does not establish as a matter of law that the damaged condition was caused solely by the inherent vice existing in the lettuce at origin.

▪ The government market report for the date the lettuce arrived at destination showed price of Texas lettuce of fair to general good quality to be $6.00 to $6.50

per carton. The trial court was authorized to consider the quality and condition of the lettuce at origin and destination, together with the evidence of market value and determine the amount of damages to be awarded shipper. The trial court was not required to award shipper the full amount of his loss as reflected by difference in net price from amount to be realized in sale to Safeway Stores. S. & D. Wolf Co. v. Atchison, Topeka & Santa Fe Ry. Co., supra.

There is no error shown in the judgment as to Count II.

The judgment of the trial court is in all things affirmed.